UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY GARCIA, | ) | CASE NO. 1:17CV1090 |
| | ) | |
| Petitioner, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| WARDEN, LASHANN EPPINGER[1], | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Respondent. | ) | OF MAGISTRATE JUDGE |
| | ) | |

On May 7, 2017, pro se Petitioner Timothy Garcia ("Petitioner") executed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which was filed with this Court on May 24, 2017.  ECF Dkt. #1.  Petitioner is currently incarcerated at the Grafton Correctional Institution in Grafton, Ohio, and is seeking relief for alleged constitutional violations that occurred during his trial in the Cuyahoga County Common Pleas Court, where he was convicted of one count of Aggravated Robbery with firearm specifications. *Id.*; ECF Dkt. #8-1 at 6. On August 2, 2017, LaShann Eppinger, Warden of the Grafton Correctional Institution (Respondent"), filed a return of writ.  ECF Dkt. #8. For the following reasons, the undersigned RECOMMENDS that the Court DISMISS Petitioner's federal habeas corpus petition in its entirety with prejudice. ECF Dkt. #1.

I.      **FACTUAL HISTORY**

The Ohio Eighth District Court of Appeals set forth the facts of this case on direct appeal. ECF Dkt. #8-1[2] at 76. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6thCir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999). As set forth by the Eighth District Court of Appeals, the facts are:

---

[1] Warden Eppinger notes that her first name is LaShann, and the docket and case caption have been modified to reflect this correction.

[2] Citations to the State Court Record, ECF Dkt. #8-1, will refer to the .PDF page numbers rather than to specific exhibits or PAGEID numbers.

{¶1} On New Year's Eve 2012, Angel Strong arranged a drug sale for Ronnie Butcher. Two men showed up but, instead of selling drugs to Butcher, they assaulted and robbed him with a gun. Strong subsequently identified Timothy García as one of the two assailants. Garcia pleaded not guilty. After a lengthy jury trial, Garcia was found guilty. Upon a careful review of the record and applicable law, we affirm his conviction.

{¶2} At trial, the state presented five witnesses in its case in chief and one rebuttal witness. The state's key witness was Angel Strong, who described the robbery as "a drug deal that went bad." She arranged the drug deal with her drug dealer "Ray" for Ronnie Butcher. Ray did not show up for the transaction, instead, Ray's father and another man Strong only knew as "Pito" showed up to rob Ronnie Butcher. The state presented testimony from its witnesses to show that Pito was Ray's cousin, defendant Timothy Garcia. The state indicted both Strong and Garcia for the robbery. Strong was cooperating with the police even before the indictment and eventually took a plea bargain from the state. Ray's father was never indicted, because the victim, Ronnie Butcher, was unable to identify him from a photo array; Ray's father died in a car accident before the trial took place.

{¶3} The defense presented three witnesses—Garcia's sister, his mother, and his cousin Jeffery Perez—who provided an alibi and testified that Garcia was in his house on New Year's Eve.

{¶4} We begin our review with a summary of the testimony of the state's three main witnesses: the victim Ronnie Butcher, Angel Strong, and Det. William Gonzalez, who investigated this case.

**I. Victim Ronnie Butcher's Testimony**

{¶5} Butcher, the robbery victim, was addicted to Percocet that he traced to a back injury. On New Year's Eve, he called his friend Brandy Burriss to help him buy a large quantity of Percocet pills. Burriss contacted Angel Strong. Strong indicated her drug dealer could sell Butcher 180 Percocet pills at $7 apiece.

{¶6} Around noon, Butcher and his friend Burriss went to Angel Strong's mother's house, where both Angel Strong and her mother lived at the time, to wait for the dealer. Ten or 15 minutes later, there was a knock at the door and Angel Strong opened the door. Two men came in. The first man made eye contact with Butcher, said "what's up?" and immediately pulled a black 9 mm gun. He pointed the gun at Burriss and told her to face the wall. The second man began beating Butcher with his fists, and he covered Butcher's face with the hood of Butcher's jacket, to avoid being seen. The first man demanded money from Butcher, saying "Give me money or I'm going to kill you. I'm going to kill her [Burriss]. Where's the money at? Where's your phone at?" Butcher threw the $1,200 he had with him and his cell phone on the floor. The first man then shuffled through Butcher's pocket, and hit him in the head with his gun, while the second man continued beating him. After the robbery, the two men quickly left the house.

{¶7} Butcher, in a daze, asked Angel Strong what just happened. Strong was evasive, saying "it wasn't supposed to happen like that." She said the two men were "Big Pito" and "Little Pito," but gave Butcher conflicting information about who they were.

{¶8} Butcher went to the police the next day to report the robbery. He told the police he would be able to identify the first man—because the man had looked him in the eyes—but not the second man. He described the first man as "six foot something" and

"200 pounds." He also told the police that although the two men were Big Pito and Little Pito, they did not appear to be father and son from the way they talked to each other during the robbery. Both men had a Spanish accent. Butcher also told the police he felt Angel Strong was involved in the robbery.

{¶9} Butcher testified that he identified defendant Timothy Garcia from a photo lineup as the first man—the man who assaulted and robbed him with a gun—but with only 50 percent certainty. He identified Garcia in court as the first assailant, however, with 100 percent certainty.

{¶10} Butcher's testimony also revealed that only a few days before the New Year's Eve robbery, he had also bought Percocet through Brandy Burriss and Angel Strong. On that occasion, he bought the drug from a dealer Strong referred to as Ray, who happened to have a cast on his arm. Butcher testified that Ray was not one of the two men who robbed him on New Year's Eve.

{¶11} Butcher also testified that he had been threatened at a barber shop by a friend of Garcia, who warned him not to testify.

**II. Angel Strong's Testimony**

{¶12} Angel Strong provided the most specific and incriminating testimony against the defendant. Strong acknowledged that she used to be a heroin addict. In exchange for heroin or money, she would help set up drug transactions for her dealer Ray. On New Year's Eve, when her friend Brandy Burriss called her to arrange a sale of Percocet pills for Ronnie Butcher, she called Ray. The drug sale was to take place in Strong's mother's house.

{¶13} While Strong, Burriss, and Butcher waited in the house, Strong talked over the phone with Ray, who indicated that his father would be delivering the Percocet pills soon. Ten minutes later, however, someone whom she knew only as Pito walked through the door with a gun, followed by Ray's father. After robbing Butcher with a gun, the two men ran out of the house. A 911 call was made later to report the armed robbery. Strong did not remember whether she or her mother made the 911 call.

{¶14} Strong's recollection of certain details of the robbery differed somewhat from Butcher's. While Butcher testified there was a knock on the door and Strong opened the door, Strong testified the two men walked in without knocking. Butcher testified only the first man had a gun; Strong testified both men carried a gun.

{¶15} Strong testified that she knew the two men from past drug deals. The first man into the house was Pito, and the second man was Ray's father. When she bought drugs from Ray in the past, either Ray's father or Pito would be in the vehicle with Ray. Strong estimated she had seen Pito 15 or 20 times before the night of the robbery. She thought Pito was Ray's cousin. Strong identified defendant Timothy Garcia in court as the man she knew as Pito.

{¶16} Consistent with Butcher's testimony, Strong also revealed that, only days before the robbery incident, she had arranged a sale of Percocet pills between Ray and Butcher. Apparently Ray was not a complete stranger to Butcher. Strong testified that, when Butcher saw Ray on that occasion, Butcher appeared to recognize Ray as someone he had seen in the past.

{¶17} A few days after the New Year's Eve robbery incident, Strong was contacted by Det. Gonzalez of the Cleveland police department. Strong testified that she initially

3

did not provide a truthful account of what had occurred, for fear her mother would throw her out of the house. On her mother's advice to "come clean," Strong was subsequently willing to cooperate with the police. She, however, only knew the two men by their street names. She knew the first man as Pito and the second man—Ray's father—as Big Pito.

{¶18} Somewhat fortuitously, Pito suddenly showed up on her Facebook page as one of the "People You May Know." Pito was suggested on her Facebook page as a "friend" apparently because she was a "friend" on Facebook with Ray's girlfriend, who in turn was a "friend" on Facebook with Pito. Pito was on Facebook under the name "Pistol Papa Pete." Now having a picture of his face besides his street name, Strong went to the police to help identify Pito. At the police station, she pulled up her Facebook page on a police computer and showed Det. Gonzalez Pito's profile page. Strong helped the detective retrieve several pictures of Pito in various poses from his Facebook page.

{¶19} Strong acknowledged her past heroin addiction, but testified that she has been sober for about a year and a half. She also acknowledged that she herself was indicted for the instant robbery with defendant Garcia, but took a plea bargain from the state. Under the plea bargain, she pleaded to robbery, an F–4 offense, and received two years of community control sanctions, in exchange for testifying truthfully in this case. Strong testified that she did not know Ray's father was coming to the house to rob Butcher. She pleaded guilty because she felt responsible for having set up the drug deal. She testified that, although initially reluctant, she began to cooperate with the police at the urging of her mother a month after the incident, long before she was indicted and pleaded guilty under the plea bargain.

{¶20} Strong also testified that she had received an anonymous, threatening phone call telling her not to testify in this case. In addition, she testified that Ray's father, the second man in the robbery, died in a car accident subsequent to the robbery.

### III. Testimony of Det. William Gonzalez

{¶21} Det. Gonzalez testified that around 8 p.m. on New Year's Eve, a 911 call was made by Strong's mother about an incident in her house. Ronnie Butcher reported the robbery the next day. Two males and a female, Angel Strong, were listed as suspects. Angel Strong initially told him that the incident was a random robbery, but then admitted the robbery was "a drug deal that went bad." She knew the two men from past drug transactions, but only knew their street names, Big Pito and Little Pito.

{¶22} Later, Strong informed Det. Gonzalez that she could help the police identify the first man in the robbery, because he had shown up on her Facebook page. She logged into her Facebook page on a police computer and pulled up the man's profile page, which was under the name Pistol Papa Pete.

{¶23} Pistol Papa Pete's profile page did not show his real name, but it had his birthday and a street name. Det. Gonzalez entered the information into Ohio Law Enforcement Gateway (a police database) and, with further research, was able to find his real name, Timothy Garcia, and also his BMV photo.

{¶24} Strong was also able to use her Facebook to find the profile page of the second man in the robbery, Ray's father. His name was Jose Rodriguez. When the police put together an photo array for both Garcia and Jose Rodriguez and asked the victim Butcher to identify the suspects, Butcher was unable to identify Jose Rodriguez from the photo array, but was able to identify Garcia as the first man in the robbery, with

4

50 percent certainty.

{¶25} Det. Gonzalez testified that Garcia and Strong were both indicted, and the prosecutor made a proffer to Strong. He testified, however, that Strong had been cooperating with the police at the urging of her mother, long before she was indicted and offered a plea.

{¶26} Det. Gonzalez also testified that Ray was not a suspect in this case because Butcher told him that Ray, who had sold him drugs only days before, was not involved in the robbery.

## IV. Defense Witnesses

{¶27} The defense presented an expert on eyewitness identification, Dr. Dario Rodriguez, to testify regarding factors that may affect the accuracy of eyewitness identification. The trial court, after conducting a Daubert hearing on the expert, permitted the expert to testify extensively about factors that may affect the accuracy of eyewitness identification.

{¶28} In addition, Garcia's sister Christina Galarza, his mother Lydia Perez, and cousin Jeffrey Perez testified on his behalf. All three attempted to provide an alibi for him.

## 1. Garcia's Sister

{¶29} Garcia's sister testified that she and Garcia were at their mother's house during the day on New Year's Eve 2012. Garcia left around 10:30 a.m. to buy ice for a large family gathering of about 50 people later that day, and he returned ten minutes later. He was then cleaning up for the party with some cousins. Garcia then left around 4 p.m. with cousin Jeffrey to go shopping for a new shirt for New Year's Eve.

{¶30} Garcia's sister testified that she has a cousin "Ray Ray." His father was her uncle Raymond. Raymond was "a very bad person." He was incarcerated for 17 years, and returned to the area not long before New Year's Eve 2012. He died in September 2014 when his vehicle hit a telephone pole.

{¶31} Garcia's sister testified her brother and cousin "Ray Ray" were close. "Ray Ray" was at the New Year's Eve party. She testified that "Ray Ray" was on the "straight and narrow" in the past but changed when his father returned from prison.

{¶32} The defense elicited testimony from Timothy Garcia's sister about his character to show that his character was not consistent with being involved in the armed robbery he was charged with. The defense counsel asked her, "Do you know your brother to be in any kind of gang or involved in drug dealing?" She answered "no." The defense counsel also asked, "To your knowledge has your brother ever been involved in anything violent?" She answered "no," and went on to describe him as a quiet guy who kept to himself and was very gentle with younger members of the family. The defense counsel asked her if she considered her brother to be a violent person. She again answered in the negative. The defense counsel then asked her if she knew him to own a weapon, she answered negatively. She also denied having any association with any drug users or drug dealers, except for acknowledging that her cousin "Ray Ray" was recently arrested for a drug offense.

{¶33} After Garcia's sister again stated on the cross-examination by the state that she did not know Garcia to be a violent person and would be surprised to see him holding

5

a gun, the state introduced exhibit No. 1–A, a picture of Garcia holding a gun, one of the several photographs from his Facebook page under the name Pistol Papa Pete. His sister acknowledged that it was indeed a picture of Garcia, but stated she had never seen the picture before. The state also asked Garcia's sister about his employment. She answered he worked at McDonald's for many years. The state then introduced its exhibit No. 2, which was Garcia displaying a large stack of cash in his hands.

{¶34} The state also introduced exhibit Nos. 3 and 4, which were Garcia making a certain hand sign. Again his sister acknowledged it was Garcia in the pictures but stated she had never seen any of these pictures.

{¶35} Outside the presence of the jury, the state informed the trial court that it intended to later call a rebuttal witness, a Cleveland police detective familiar with gangs, in response to Garcia's sister's testimony. The rebuttal witness would testify that the hand sign was a unique gang sign for a notorious gang active on Cleveland's west side. The defense objected. The trial court allowed the witness on the grounds that the defense brought up the issue of gang affiliation.

{¶36} During the defense counsel's direct examination of Garcia's sister, counsel elicited testimony from her that it would take 15 minutes from the house on West 50th Street, where the robbery occurred, to her mother's house on West 47th Street. On cross-examination by the state, the state showed Garcia's sister an exhibit, a Google map, which showed that the driving distance between the two houses was only eight minutes. Garcia's sister testified that it would take longer than eight minutes because one of the streets in between had been closed, and there were several lights between the two points.

## 2. Garcia's Mother

{¶37} Garcia's mother, Lydia Perez, also attempted to provide an alibi for her son. She testified that around 10:00 or 10:15 a.m., she asked her son to buy ice for the family gathering of 70 people. He came back in 15 to 20 minutes. She then asked Garcia and his cousins to help clean up the house for the party. It took them about an hour or two for the cleanup. She remembered it was around 2:30 or 3:00 p.m. when her son left the house again.

{¶38} She testified that her son was close to his cousin "Ray Ray," but the relationship changed somewhat after "Ray Ray's" father returned from prison.

{¶39} The defense counsel asked whether her son was involved in a street gang. She answered "no."

{¶40} On cross-examination by the state, Garcia's mother was asked whether anyone in her family had been involved in the use or sale of drugs. She answered that three of them were: she and two brothers of hers. She stated she used drugs 13 or 14 years ago and, before that, she was twice convicted of a felony drug trafficking offense. She acknowledged that her daughter Christina may have known about her drug problem and that her daughter's testimony that no one in the family had been associated with drugs would be inaccurate.

{¶41} After that testimony, the state asked Lydia Perez about her son's drug case in 2012 and his entering an "intervention in lieu of conviction" program under a plea in that case. At this point, the defense called for a mistrial. The trial court denied the request. The court subsequently instructed the jury that the testimony about the defendant's guilty plea to a drug offense and his entry into a treatment program were

6

for impeachment purposes only, and no inference was to be made from the past drug offense in considering the defendant's guilt in the present case.

### 3. Garcia's Cousin

{ ¶ 42} Garcia's cousin, Jeffrey Perez, gave alibi testimony as well. He testified that, on New Year's Eve 2012, he arrived at his aunt's house around 10:00 a.m., and half an hour later, Garcia left to buy some ice. He returned 15 minutes later. He and Garcia then spent an hour cleaning up the house for the party. The two left around 2:30 p.m. to shop for clothing. He testified that from 11:00 a.m. to 2:30 p.m., he and Garcia were both around the house. Garcia played video games somewhere in the house.

{¶43} At one point in Jeffrey Perez's testimony, Perez referred to Garcia as Pito when Perez stated that his (Perez's) father owned a painting business and would occasionally employ himself and Pito, referring to Garcia. This was the first time Garcia was referred to as Pito by family members. Perez's testimony was: "he [referring to Perez's father] primarily works for himself so he would get jobs, and if he needed me or Pito or Timothy, excuse me, he would—it would be one of us." When the defense counsel later asked him if he had ever heard of the name Pito, he initially denied it, but later acknowledged that he called his cousin, Timothy Garcia, by his nickname Pito. He explained that Garcia's mother used to call Garcia "Papito" when he was little, and the name stuck with him, but Perez emphasized though that no one outside of the family called him by that name.

## V. The State's Rebuttal Witness

{¶44} After the testimony of the defense witnesses, the state called a rebuttal witness, Det. Todd Staimpel, a detective knowledgeable about the gangs on the west side, specifically the Band Boys Enterprise 900 ("BBE 900"). He testified that the number 900 was a reference to the area of West 90th Street and Madison Avenue, and the gang sign was a symbol for "900." The sign consisted of turning the wrist in a certain angle and holding up three fingers to make an O sign. When shown state's exhibit Nos. 3 and 4, the pictures of Garcia making a hand sign, the detective testified that the hand sign was the unique BBE gang sign. He also testified that there would be retaliation if someone not a gang member posed with the gang sign.

{¶45} Detective Staimpel testified that the BBE members were known to be very active on social media. They would post videos on YouTube and Facebook of rap songs with lyrics depicting violence. It was also common for the gang members to flash the BBE gang sign on Facebook and to post pictures of themselves holding a gun. The gang members robbed, assaulted, and intimidated citizens. Sometimes they would jump on people just walking down the street for no reason. They would then brag about these attacks on Facebook. Detective Staimpel also testified that Garcia's house was in the general geographical territory of the gang.

{¶46} After a lengthy trial, the jury found Garcia guilty of aggravated robbery and the firearm specifications. The trial court sentenced him to six years on the aggravated robbery offense and three years on the firearm specifications, for a total of nine years.

ECF Dkt. #8-1 at 76-90.

7

## II.     PROCEDURAL HISTORY

### A.     State Trial Court

In its January of 2013 term, the Cuyahoga County Grand Jury indicted Petitioner on one count of Aggravated Robbery in violation of Ohio Revised Code "("ORC") § 2911.01(A)(1) with a one-year firearm specification and a three-year firearm specification. ECF Dkt. #8-1 at 3.

On November 12, 2014, the trial court journalized the jury's verdict finding Petitioner guilty as charged in the indictment.  ECF Dkt. #8-1 at 6.  On January 23, 2015, the trial court sentenced Petitioner to 6 years in prison fr the Aggravated Robbery conviction and 3 additional and consecutive years in prison for the firearm specifications. *Id.* at 7. The total sentence was 9 years in prison. *Id.*

### B.     Direct Appeal

On January 27, 2015, Petitioner, through appellate counsel, appealed to the Ohio Court of Appeals of Cuyahoga County, Eighth Appellate District. ECF Dkt. #8-1 at 8. In his appellate brief filed on April 27, 2015, Petitioner, through appellate counsel, raised the following assignments of error:

1.     THE TRIAL COURT ERRED BY PERMITTING THE INTRODUCTION OF IRRELEVANT AND PREJUDICIAL PHOTOGRAPHS.

2.     THE TRIAL COURT ERRED BY PERMITTING THE STATE TO ELICIT IMPROPER IMPEACHMENT AND OTHER ACTS TESTIMONY.

3.     THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR A MISTRIAL.

4.     THE TRIAL COURT ERRED BY PERMITTING TESTIMONY FROM THE STATE'S REBUTTAL WITNESS ABOUT GANGS AND GANG ACTIVITY.

5.     THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS AN IMPERMISSIBLY SUGGESTIVE AND UNRELIABLE PHOTO IDENTIFICATION.

6      APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE.

7.     APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

8

ECF Dkt. #8-1 at 17-45. The State filed a brief in opposition. *Id.* at 46-73. On February 18, 2016, the court of appeals overruled each assignment of error on the merits and affirmed the judgment of the trial court. *Id.* at 74-110.

### C. Motion for Delayed Appeal to Supreme Court of Ohio

On August 12, 2016, Petitioner pro se filed a motion for leave to file a delayed appeal in the Ohio Supreme Court. ECF Dkt. #8-1 at 118. Petitioner asserted that he could not timely file his notice of appeal to the Ohio Supreme Court because his appellate counsel did not notify him of the appellate court decision until March 15, 2016 and he did not receive his Ohio Supreme Court packet until March 23, 2016. *Id.* He stated that this short amount of time in which to file an appeal was insufficient since he knew nothing about filing an appeal. *Id.* He also indicated that he had trouble making copies because the institution's copy machine was down and he had trouble putting his packet together. *Id*. at 118-119.

On October 5, 2016, the Ohio Supreme Court denied Petitioner's motion for a delayed appeal. ECF Dkt. #8-1 at 168.

### III. FEDERAL HABEAS CORPUS PETITION UNDER 28 U.S.C. § 2254

On May 7, 2017, Petitioner executed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254, which was filed in this Court on May 24, 2017. ECF Dkt. #1. In his petition, he presents the following grounds for relief:

> GROUND ONE
>
> Supporting Facts: The trial court abused its discretion when it allowed the state to elicit improper witness testimony about Petitioner's family involvement in drugs and his prior drug case. Because petitioner's prior drug case had no relevance to whether petitioner committed the crimes for which petitioner was charged, yet the trial court allowed it all into evidence. And the trial court abused that discretion by swinging the door open for cross-examination in an effort to establish a witness bad acts or criminal character. And the trial court abused its discretion when it allowed the testimony into evidence. Which violates due process.
>
> GROUND TWO
>
> Supporting Facts: When Petitioner's mother testified on cross-examination about a matter collateral to the material issues at trial, and the state erred by using petitioner's mother's testimony as impeachment evidence, because the state was not permitted to elicit impeachment testimony from one witness that conflicts with the testimony of another witness. Petitioner's mother[sic]testimony about familial drug use used to impeach her daughter's testimony was in fact, –[sic] extrinsic evidence,

9

and the state should not have been allowed to disprove the truth of petitioner's sister's answers by introducing extrinsic evidence in the form of petitioner's mother's testimony.

GROUND THREE:

Supporting Facts:  Petitioner was denied effective assistance of counsel, because petitioner's trial counsel performed below an objective standard of reasonable representation, because if trial counsel had not asked about drugs, gangs, and violence, the state would have not been able to attempt to rebut that testimony with pictures of petitioner holding a gun and money, and questions about petitioner's drug history, and testimony about gangs and gang signs from the rebuttal witness – all of which were extremely prejudicial to petitioner. By opening the door to the introduction of such evidence, counsel performed below a reasonable level of effectiveness and enable the prosecution to present seriously prejudicial evidence to the jury which would otherwise have been excluded. Tpe trial counsel also failed to preserve an objection to the instructions provided to the jury prior to deliberations and a new trial is wanted on the grounds that counsel failed to object and preserve the issue for appeal constituted ineffective assistance of counsel.

GROUND FOUR:

Supporting Facts:  Petitioner's rights to have a fair trial was[sic] violated when the trial court permitted the admission of irrelevant[sic[ and prejudicial photographs, because having the jury see the gun was unfairly prejudicial, either the phot[o] needed to be cropped to exclude the gun or the jury should have been told not to consider the image of the gun as evidence, despite what had been determined the prosecution introduced at trial an uncropped version of the gun photo during its cross-examination of petitioner's sister. The other two photos, showing petitioner making a hand sign, were introduced during the testimony of the state's rebuttal witness, who opined that the hand signs were gang-related, and petitioner's objection to the admission of the uncropped gun photo should have been sustained by the trial court.

GROUND FIVE:

Supporting Facts: The state's impeachment attempt was improper, because a photo of someone holding a gun (even if it is shown to be real, which was not the case here) does not by itself suggest that the person is violent. On cross-examination, the state embarked on a lengthy and improper attempt to impeach not only the credibility of Perez, but also the credibility of a witness – (Christina Galarza) who had already testified, and introduce inadmissible evidence related to petitioner. And the testimony elicited by the state from petitioner's witness was improper and should have been disallowed by the trial court, and because the testimony and related – exhibits were allowed, petitioner was unfairly prejudicial [sic] and prevented from having a fair trial, in violation of petitioner's due process rights.

GROUND SIX:

Supporting Facts:  During the State's cross-examination of petitioner's mother, counsel for petitioner objected repeatedly to the line of questioning, then when the prosecutor brought up petitioner's drug use and prior criminal charge, petitioner's counsel objected, citing grounds for a mistrial based on the nature of the inquiry. The court overruled all of petitioner's counsel's objection. After the state finished examining petitioner's witnesses, petitioner's counsel – moved for a mistrial.

10

> Counsel even renewed the motion after the verdict was read. The trial court erred by not granting the motion. Because the reference to petitioner's prior charges were[sic] more than just fleeting, and because the curative instruction was an insufficient remedy a fair trial was not possible for petitioner. As a result, petitioner's motion for a mistrial should have been granted.

ECF Dkt. #1.

On June 5, 2017, this case was referred to the undersigned pursuant to Local Rule 72.2. On August 2, 2017, Respondent filed a return of writ.  ECF Dkt. #8.  Petitioner did not file a traverse.

## IV.    APPLICABLE LAW

### A.    Procedural Barriers to Review

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus. Justice O'Connor noted in *Daniels v. United States*: "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001) (citing *United States v. Olano*, 507 U.S. 725, 731 (1993)).

#### 1.    Statute of Limitations

The AEDPA statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final. 28 U.S.C. § 2244(d)(1). The AEDPA statute of limitations is not at issue in this case.

#### 2.    Exhaustion of State Remedies

Subject to the statute of limitations, federal habeas corpus relief is only available to persons that are in custody in violation of the United States Constitution, laws or treaties. 28 U.S.C. § 2254(a); *Engle v. Isaac*, 456 U.S. 107 (1982); *Smith v. Phillips*, 455 U.S. 209, 221 (1983). As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Wilson v. Mitchell*, 498 F.3d 491, 498 (6th Cir. 2007). Exhaustion is required before a state prisoner may bring a habeas corpus petition under either 28 U.S.C. § 2241 or 28 U.S.C. § 2254. *See Collins v. Million*, 121 Fed.Appx. 628, 630-31 (6th Cir. 2005). The petitioner bears the burden of proving exhaustion. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Also, the court of appeals may raise and consider the issue of

exhaustion *sua sponte*. *Clinkscale v. Carter*, 375 F.3d 430, 438 (6th Cir. 2004) (citing *Harris v. Rees*, 794 F.2d 1168, 1170 (6th Cir. 1986)). Exhaustion does not require a state court adjudication on the merits of the claim at issue. *Clinkscale*, 375 F.3d at 438 (citing *Smith v. Digmon*, 434 U.S. 332, 333 (1978); *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990)).

The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts," which means "the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006) (citing *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Wilson v. Mitchell*, 498 F.3d 491, 498-99 (6th Cir. 2007); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). A petitioner will not be allowed to present claims never before presented in the state courts, unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991) (citing *Engle v. Isaac*, 456 U.S. 107 (1982) and *Murray v. Carrier*, 477 U.S. 478 (1986)).

In addition to full presentation, a claim must also be fairly presented to the state courts as a federal constitutional issue rather than merely as a state law issue. *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). To exhaust a claim, a petitioner must present it to the state courts under the same theory that it is later presented in federal court. *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). For a claim to be "fairly presented," the petitioner must assert both a factual and legal basis for his claim in state court. *Fulcher v. Motley*, 444 F3d 791, 798 (6th Cir. 2006). A petitioner "fairly" presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the

mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (internal citation omitted); *McMeans*, 228 F.3d at 681 (citing *Franklin*, 811 F.2d at 326). Although general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated, a petitioner is not required to recite "book and verse on the federal constitution." *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

Originally, the Supreme Court interpreted 28 U.S.C. § 2254 as providing that if a petitioner did not fulfill the total exhaustion requirement, a district court *must* dismiss the habeas petition, even if it contained both unexhausted and exhausted claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 852 (1999) (emphasis added) (citing *Rose v. Lundy*, 455 U.S. 509, 522 (1982)); *cf.* 28 U.S.C. § 2254(b)(2) (stating that "a[n] application for a writ of habeas corpus *may* be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") (emphasis added). However, the Supreme Court became concerned about petitioners losing their opportunity for federal review when the AEDPA, which was enacted in 1996, included a one-year statute of limitations. *See Rhines v. Weber*, 544 U.S. 269, 274-75 (2005). Citing *Rhines*, the Sixth Circuit laid out the options that a district court may pursue in dealing with a mixed petition that contains unexhausted claims:

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id*. at 275, 125 S.Ct. 1528; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims, *id*. at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

*Harris v. Lafler*, 553 F.3d 1028, 1031-32 (6th Cir. 2009) (citing *Rockwell v. Yukins*, 217 F.3d 421, 425 (6th Cir. 2000)).

The AEDPA, as amended, provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C.A. § 2254(b)(2). Even assuming a state court remedy is available, the District Court may nevertheless consider a petitioner's unexhausted claim if the

13

claim lacks merit and returning to state court "would amount to a mere futility." *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

### 3. Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed)). Absent either cause and prejudice or a finding of actual innocence, a federal court is not required to reach the merits of claims that have been procedurally defaulted in state court by a state prisoner or in federal court by a federal prisoner in a defendant's direct criminal appeal. *See Reed v. Farley*, 512 U.S. 339, 354-55 (1994); *William v. Anderson*, 460 F.3d 789, 805-06 (6th Cir. 2006); *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005). Also, when the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). On the other hand, the Supreme Court has held that federal courts are not always required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."). The Sixth Circuit has endorsed this view in *Hudson v. Jones* and proceeded to the merits in a habeas corpus proceeding when the question of procedural default presented a complicated question of state law and was unnecessary to the disposition of the case. *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *accord Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008), *as amended* (July 7, 2008).

14

In determining whether a state court has addressed the merits of a petitioner's claim, federal courts will apply a presumption that there is no independent and adequate state grounds for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (citing *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)); *see also Harris v. Reed*, 489 U.S. 255, 262-63 (1989) (holding that the "plain statement" rule of *Michigan v. Long* applies to federal habeas review). However, the presumption:

> does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman*, 501 U.S. at 735 n.1; *see Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.2006)) ("[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.").

Prior to the Supreme Court's ruling in *Coleman*, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). Under the *Maupin* test, a reviewing court must decide:

(1)    whether the petitioner failed to comply with an applicable state procedural rule;

(2)    whether the state courts actually enforced the state procedural sanction;

(3)    whether the state procedural bar is an "adequate and independent" state ground in which the state can foreclose federal review; and

(4)    if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and

15

regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418-20 (6th Cir. 2006). The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005), *vacated on other grounds in Bradshaw v. Richey*, 546 U.S. 74 (2005), *remanded to Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007); *Franklin*, 434 F.3d at 420.

Under the second prong, the last-explained state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *See Coleman v. Thompson*, 501 U.S. 722, 729-30, 735 (1991); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises) (superseded by statute as stated in *Parker v. Matthews*, 567 U.S. 37 (2012) on different grounds); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply). Although the Sixth Circuit has required express reliance on a procedural bar in the past, *see Baze*, 371 F.3d at 320, it has also assumed such reliance when the decision "fairly appears to rest on state law." *Smith v. Warden, Toledo Corr. Inst.*, No. 17-3220, 2019 WL 2518311, at *11 (6th Cir. June 18, 2019) (citing *Coleman*, 501 U.S. at 740).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Wilson v. Mitchell*, 498 F.3d 491, 499 (6th Cir. 2007); *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus, unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a

16

legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Geneva v. Lazaroff*, 77 Fed.Appx. 845, 850 (6th Cir. 2003); *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986) (Demonstrating "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986); *Geneva*, 77 Fed.Appx. at 850. A petitioner can also show that a fundamental miscarriage of justice will occur if the Court does not address his procedurally defaulted ground for relief. *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *Coleman*, 501 U.S. at 750. The Supreme Court described the fundamental miscarriage of justice exception as follows:

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, the Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

*Schlup*, 513 U.S. at 321. Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004). In addition, the Sixth Circuit recognized Ohio's rule that claims must be raised on direct appeal, if possible, or else res judicata bars their litigation in subsequent proceedings. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) (citing *State v. Perry*, 226 N.E.2d 104, 108 (1967)). The above standards apply to the Court's review of Petitioner's claims.

## B.      Standard of Review

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, the AEDPA governs this Court's review of his case because Petitioner filed his petition well after the Act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998); *see* ECF Dkt. #1-2. As previously stated, under

Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United

States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for a writ of habeas

corpus. The AEDPA provides the following deferential standard of review:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim –

> (1)   resulted in a decision that was *contrary to*, or involved an *unreasonable application of*,
> clearly established Federal law, as determined by the Supreme Court of the United States;
> or

> > (2)     resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. §2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the

language of 28 U.S.C. §2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this Court on a question of
> law or if the state court decides a case differently than this Court has on a set of
> materially indistinguishable facts. Under the "unreasonable application" clause, a
> federal habeas court may grant the writ if the state court identifies the correct
> principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000). Furthermore, the Supreme Court declared that "a federal habeas court

making the 'unreasonable application' inquiry should ask whether the state court's application of

clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term

"objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ

simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly. Rather, that application

must also be unreasonable." *Id.*; *see Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001);

*Earhart v. Konteh*, 589 F.3d 337, 343 (6th Cir. 2009).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA

limitations:

> A.     Decisions of lower federal courts may not be considered.

18

B.      Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.      The state court decision may be overturned only if:

      1.     It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

      2.     the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

      3.     'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

      4.     the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.      Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.      Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted); *see Casnave v. Lavigne*, 169 Fed.Appx. 435, 438-39 (6th Cir. 2006).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant

19

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e). The presumption of correctness applies to basic, primary, or historical facts, and not to mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-12 (1995). The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Id.*; *see McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014) (citing *Thompson*, 516 U.S. at 111). Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law. *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V.   LAW AND ANALYSIS

### A.     Ground for Relief Number 1

Respondent asserts that Petitioner's first ground for relief is not cognizable before this Court and is alternatively procedurally defaulted.  ECF Dkt. #8 at 18-22.  In his first ground for relief, Petitioner argues that the "trial court abused its discretion when it allowed the state to elicit improper witness testimony" about his prior drug case and his family's involvement in drugs, which had no relevance to Petitioner's charge and "[w]hich violates due process."  ECF Dkt. #1 at 5.  The undersigned agrees with Respondent and recommends that the Court find that this ground for relief is not cognizable before this Court and/or is procedurally defaulted.

A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir.1988).  A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a).  "A federal habeas court "must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir.2005) (internal quotation omitted).  Accordingly,

"alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012). However, state-court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). They must be "so egregious that [they] result[ ]in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[C]ourts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.' " *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

In his first ground for relief, Petitioner contends that the trial court "abused its discretion," which is generally not a basis for federal habeas corpus relief without more. *See Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001). Moreover, a trial court's alleged incorrect interpretation of its own state evidence rules or Ohio laws is not cognizable in federal habeas corpus review. *See Estelle*, 502 U.S. at 482. In his Ohio appellate brief, Petitioner relied solely on Ohio law in presenting his assertion of trial court error in allowing his mother's testimony concerning his prior drug activity and the family's involvement in drugs. ECF Dkt. #8-1 at 30-34. The Ohio appellate court reviewed the claim under Ohio law and rejected it. *Id*. at 94-105. The only hint of a possible federal constitutional issue is in Petitioner's first ground for relief when he contends that this testimony about his prior activity and his family's involvement in drugs "violates due process." ECF Dkt. #1 at 5. However, using general phrases like "due process of law" or "fair trial" do not rise to the level of raising a federal constitutional issue. *Fulcher*, 444 F.3d at 798; *Newton*, 349 F.3d at 877.

Additionally, or alternatively, the undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief. Even presuming that Petitioner had presented this ground for relief as a proper federal constitutional claim in the Ohio appellate court, and the Ohio appellate court had addressed it as such, he failed to timely file an appeal from that decision to the Ohio Supreme Court. Petitioner had 45 days from the entry of the Ohio appellate

court judgment in which to file a timely appeal.  Ohio Sup.Ct. Prac. R. 7.01(A)1)(a).  He did not do so, but rather, he filed a motion for leave to file a motion for delayed appeal.  ECF Dkt. #8-1 at 117.  The Ohio Supreme Court denied Petitioner's motion for leave to file a delayed appeal.  ECF Dkt. #8-1 at 168.  The Ohio Supreme Court's denial of a motion for leave to file a delayed appeal constitutes a "procedural ruling sufficient to bar federal court review" of a ground for relief in a federal habeas corpus petition.  *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004).  Morever, when a state court is silent as to the reasons upon which it denies relief, such as here, this Court "assumes that the state court would have enforced any applicable procedural bar."  *Id*., citing *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996).  As explained in *Bonilla* and applicable in the instant case, "[Petitioner] failed to file a timely notice of appeal with the Ohio Supreme Court and his motion for leave to file a delayed appeal was denied by that court apparently because he failed to demonstrate adequate reasons for his failure to file a timely notice of appeal or to otherwise comply"with the proper provisions under the Ohio Supreme Court Rules of Practice. *Bonilla*, 370 F.3d at 497.  Accordingly, Petitioner has procedurally defaulted his first ground for relief.

Petitioner can excuse his procedural default if he shows sufficient cause to excuse his untimely filing and prejudice resulting from not reviewing his ground for relief, or if he can show that a miscarriage of justice would result from not reviewing this ground for relief.  Petitioner asserts in his federal habeas corpus petition that he failed to raise Grounds for Relief Numbers 1-5 in the Supreme Court of Ohio because "the Petitioner's delayed memorandum in support of jurisdiction was denied, because Petitioner's[sic] was pro se and thought he had the continuing services of counsel to file a timely memorandum in support of jurisdiction." ECF Dkt. #1 at 12. The Ohio Supreme Court's implied denial of the opportunity for Petitioner to file a memorandum in support of jurisdiction has nothing to do with Petitioner's failure to timely file an appeal to the Ohio Supreme Court.  Further, a prisoner's pro se status and ignorance of the law do not constitute adequate cause to excuse a procedural default.  *Bonilla*, 370 F.3d at 498, citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995).  And finally, the undersigned questions Petitioner's assertion in his federal habeas corpus petition that he thought he still had representation by counsel before

the Ohio Supreme Court since he did not present this assertion to the Ohio Supreme Court in his motion for leave to file a delayed appeal or in his accompanying affidavit. ECF Dkt. #8-1 at 118-121. Petitioner explains to the Ohio Supreme Court that he did not timely file his appeal because his appellate attorney notified him of the Ohio appellate court decision on March 15, 2016 and he did not receive his Ohio Supreme Court packet for appeal until March 23, 2016. *Id.* at 118. This is the only reference that he made about his appellate attorney. Surely he would have raised the issue that he thought he still had his appellate counsel's services on appeal to the Ohio Supreme Court in his motion for leave to file a delayed appeal to that court. Yet he did not. He even indicated that he still managed to complete the packet and he needed help compiling the packet contents. *Id*. at 118-119. In addition, Petitioner did not exhaust claim of the ineffective assistance of appellate counsel as to this issue and thus it cannot serve as cause to excuse his procedural default because such a claim itself is procedurally defaulted. *See Edwards*, 529 U.S. 446 (claim of ineffective assistance of appellate counsel cannot serve as cause to excuse procedural default when that claim itself has been procedurally defaulted). Finally, Petitioner makes no assertion concerning a miscarriage of justice or his actual innocence and he presents no new, reliable evidence of such innocence. For the above reasons, the undersigned recommends that the Court find that Petitioner has not presented adequate cause to excuse his procedural default and he has failed to establish a miscarriage of justice in order to excuse his procedural default.

For these reasons, the undersigned recommends that the Court decline to review Petitioner's first ground for relief because it is not cognizable before this federal habeas corpus Court and/or it is procedurally defaulted.

### B.    Ground for Relief Number 2

Respondent again asserts noncognizability and procedural default as reasons for this Court to decline review of Petitioner's second ground for relief.  ECF Dkt. #8 at 22-27.  In his second ground for relief,  Petitioner contends that the State of Ohio should not have been allowed to use the extrinsic evidence of his mother's testimony about the family's drug use to impeach his sister's testimony. ECF Dkt. #1 at 7.  Respondent relies upon the same reasons and analysis that was

23

presented in response to Petitioner's first ground for relief.  ECF Dkt. #8 at 22-27.  The undersigned again agrees with Respondent and recommends that the Court find that this ground for relief is noncognizable and/or is procedurally defaulted.

A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley*, 465 U.S. at 41; *Sowders*, 848 F.2d at 738.  A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a).  Accordingly, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review" unless they "rise to the level of due process violations [if] they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Moreland,* 699 F.3d at 923; *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). They must be "so egregious that [they] result[ ]in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512. "[C]ourts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

As in his first ground for relief, Petitioner again essentially contends that the trial court abused its discretion, this time by allowing the State of Ohio to use the "extrinsic evidence" of his mother's testimony to impeach the testimony of his sister.  ECF Dkt. #1 at 7.  The Ohio Rules of Evidence and the issue of abuse of a state trial court's discretion are issues of Ohio law, which are not cognizable before this federal habeas corpus Court.  This ground for relief was presented as a state law issue before the Ohio appellate court and the Ohio appellate court applied Ohio law in denying the claim.  ECF Dkt. #8-1 at 30-34, 94-105.  A trial court's alleged incorrect interpretation of its own state evidence rules or Ohio laws is not cognizable in federal habeas corpus review.  *See Estelle*, 502 U.S. at 482.  As explained more fully in addressing Petitioner's first ground for relief above, the undersigned thus recommends that the Court find that this ground for relief is also not cognizable in federal habeas corpus review.

In addition, or in the alternative, the undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief.  Even if Petitioner had presented this ground for relief as a proper federal constitutional claim in the state appellate court, and the state appellate court had addressed it as such, he failed to timely file an appeal from that decision to the Ohio Supreme Court.  Petitioner had 45 days from the entry of the Ohio appellate court judgment in which to file a timely appeal.  Ohio Sup.Ct. Prac. R. 7.01(A)1)(a).  He did not do so and filed a motion for leave to file a motion for delayed appeal in the Ohio Supreme Court.  ECF Dkt. #8-1 at 117.  That Court denied Petitioner's motion for leave to file a delayed appeal.  ECF Dkt. #8-1 at 168.  The denial of a motion for leave to file a delayed appeal by the Ohio Supreme Court constitutes a "procedural ruling sufficient to bar federal court review" of a ground for relief in a federal habeas corpus petition.  *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004).  Morever, when a state court is silent as to the reasons upon which it denies relief, such as here, this Court "assumes that the state court would have enforced any applicable procedural bar." *Id*., citing *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996).  Accordingly, Petitioner has procedurally defaulted his second ground for relief.

Again, Petitioner can excuse his procedural default if he shows sufficient cause to excuse his untimely filing and prejudice resulting from not reviewing his ground for relief, or if he can show that a miscarriage of justice would result from not reviewing this ground for relief.  As explained in the analysis of Ground for Relief Number 1, Petitioner asserts in his federal habeas corpus petition that he failed to raise Grounds for Relief Numbers 1-5 in the Supreme Court of Ohio because "the Petitioner's delayed memorandum in support of jurisdiction was denied, because Petitioner's[sic] was pro se and thought he had the continuing services of counsel to file a timely memorandum in support of jurisdiction."  ECF Dkt. #1 at 12. As explained above, the Ohio Supreme Court's implied denial for Petitioner to file a memorandum in support of jurisdiction has nothing to do with his failure to timely file an appeal to the Ohio Supreme Court and his pro se status and ignorance of the law do not constitute adequate cause to excuse a procedural default.  *Bonilla*, 370 F.3d at 498, citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995).  And again,

the undersigned questions Petitioner's assertion that he thought he still had representation by counsel before the Ohio Supreme Court because Petitioner did not present this important assertion to the Ohio Supreme Court in his motion for leave to file a delayed appeal or in his accompanying affidavit.  ECF Dkt. #8-1 at 118-121.  In addition, Petitioner did not exhaust claim of the ineffective assistance of appellate counsel as to this issue and thus it cannot serve as cause to excuse his procedural default because such a claim itself is procedurally defaulted.  *See Edwards*, 529 U.S. 446 (claim of ineffective assistance of appellate counsel cannot serve as cause to excuse procedural default when that claim itself has been procedurally defaulted).  Finally, Petitioner makes no assertion about a miscarriage of justice or his actual innocence.  For the above reasons, the undersigned recommends that the Court find that Petitioner has not presented adequate cause to excuse his procedural default and he has failed to establish a miscarriage of justice in order to excuse his procedural default.

For these reasons, the undersigned recommends that the Court decline to review Petitioner's second ground for relief because it is not cognizable before this federal habeas corpus Court and/or it is procedurally defaulted.

### C.      Ground for Relief Number 3

As to Petitioner's third ground for relief, Respondent also asserts that he has procedurally defaulted this ground or alternatively, it is without merit.  ECF Dkt. #8 at 27-36.  Respondent contends that Petitioner failed to fairly present to the state courts the ineffective assistance of counsel claim that he presents before this Court and he failed to timely appeal the state appellate court's decision affirming his conviction to the Ohio Supreme Court and the latter court denied his motion for leave to file a delayed appeal.  *Id*.  Respondent alternatively asserts that Petitioner's ineffective assistance of counsel claim is without merit.  *Id*.

In his third ground for relief, Petitioner alleges that his trial counsel was ineffective because his counsel asked about drugs, gangs, and violence at trial, which opened the door to rebuttal by the prosecution, who presented pictures of him holding a gun and money and presenting testimony about his drug history and gangs and gang signs.  ECF Dkt. #1 at 8-9.  He claims that his trial

26

counsel "also failed to preserve an objection to the instructions provided to the jury prior to deliberations and a new trial is wanted on the grounds that counsel failed to object and preserve the issue for appeal constituted ineffective assistance of counsel." *Id*. at 9.

In the fifth assignment of error in his Ohio appellate brief, Petitioner raised the ineffective assistance of trial counsel, asserting counsel's ineffectiveness for opening the door to impeachment on cross-examination by the State of Ohio when his counsel asked his sister on direct testimony about whether she knew if Petitioner was in a gang, involved in drug activity, or had been involved in any violent activities. ECF Dkt. #8-1 at 37-38.  Petitioner complained that this question allowed the State of Ohio to rebut his sister's testimony with pictures of him holding a gun and money, and the State of Ohio also presented testimony regarding his drug history and gangs and gang signs. *Id*. at 38.  Petitioner also asserted that trial counsel was ineffective by failing to object to the introduction of the State of Ohio's exhibits supposedly making gang-related hand signs and jury instructions relating thereto. *Id.*

Petitioner did not present the issue of his counsel's failure to object to jury instructions to the Ohio appellate court.  A federal habeas petitioner is limited to presenting in his federal habeas corpus petition the same ineffective assistance of counsel claims under the same legal and factual theories that he presented in the state court.  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Further, Petitioner could have raised the ineffectiveness of counsel by for failing to object to jury instructions issues on appeal as it was apparent from the record.  Accordingly, he cannot raise this issue before this Court.

Further, while Petitioner presented a timely appeal to the Ohio appellate court as to counsel's ineffectiveness by asking his sister about gang signs and activities, and in failing to object to evidence concerning gangs, he failed to timely appeal the Ohio appellate court's decision to the Ohio Supreme Court. ECF Dkt. #8-1 at 107-110, 117-121.  Since Petitioner failed to timely file an appeal to the Ohio Supreme Court, and that court denied Petitioner's motion for leave to file a delayed appeal, Petitioner has procedurally defaulted his ineffective assistance of counsel claim. In addition, Petitioner's ineffective assistance of counsel claims are barred by the doctrine of res

27

judicata as they were apparent on the record and should have and could have been raised on direct appeal, including to the Ohio Supreme Court. The federal courts have recognized that the Ohio courts have consistently applied *res judicata* and it is an adequate and independent state ground under *Maupin* for applying procedural default. *See Williams*, 380 F.3d at 967.

As explained more thoroughly in this Report and Recommendation addressing the preceding Grounds for Relief, Petitioner can avoid the procedural default of this ground for relief if he shows cause and prejudice or a miscarriage of justice that probably resulted in the conviction of someone who is actually innocent. For the reasons explained above, the undersigned recommends that the Court find that Petitioner's reasons for excusing his procedural default are insufficient and he presents no assertion concerning actual innocence or a miscarriage of justice. Accordingly, the undersigned recommends that the Court find that Petitioner has procedurally defaulted his third ground for relief.

### D. Grounds for Relief Numbers 4 and 5

Respondent also submits that Petitioner's fourth and fifth grounds for relief are each noncognizable and barred by procedural default. ECF Dkt. #8 at 36-39. In Ground for Relief Number 4, Petitioner asserts that his right to a fair trial was violated when the trial court erroneously allowed irrelevant and prejudicial photographs of him making hand signs and a picture of him holding a gun should have been cropped or the jury should have been told not to consider any of the pictures as evidence. ECF Dkt. #1 at 9.

Again, allegations of trial court error in interpreting its own state evidence rules or Ohio laws are not cognizable in federal habeas corpus review. *See Estelle*, 502 U.S. at 482. In his brief to the Ohio appellate court, Petitioner relied solely on the Ohio evidence rules and Ohio law in asserting that the trial court erred in allowing the introduction of the photographs. ECF Dkt. #8-1 at 27-29. The Ohio appellate court reviewed the claim solely under Ohio law and rejected it. *Id.* at 95-98. The only hint of a possible federal constitutional issue raised by Petitioner before the Ohio appellate court in his brief was when he asserted that the admission of these photographs violated his right to a "fair trial, in violation of his due process rights." ECF Dkt. #8-1 at 32.

28

However, using general phrases like "due process of law" or "fair trial" do not rise to the level of raising a federal constitutional issue. *Fulcher*, 444 F.3d at798; *Newton*, 349 F.3d at 877.

Additionally, or alternatively, the undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief. Even presuming that Petitioner properly presented this ground for relief in the Ohio appellate court he failed to timely file an appeal from that decision to the Ohio Supreme Court. Ohio Sup.Ct. Prac. R. 7.01(A)1)(a). He filed a motion for leave to file a motion for delayed appeal, which the Ohio Supreme Court denied. ECF Dkt. #8-1 at 117, 168. That denial of the motion for leave to file a delayed appeal constitutes a "procedural ruling sufficient to bar federal court review" of a ground for relief in a federal habeas corpus petition. *Bonilla*, 370 F.3d at 497. Accordingly, Petitioner has procedurally defaulted his fourth ground for relief, unless he can show sufficient cause to excuse his untimely filing and prejudice resulting from not reviewing his ground for relief, or if he can show that a miscarriage of justice would result from not reviewing this ground for relief. As explained above in addressing Grounds for Relief Number 1, 2, and 3, Petitioner states that he failed to raise Grounds for Relief Numbers 1-5 in the Supreme Court of Ohio because "the Petitioner's delayed memorandum in support of jurisdiction was denied, because Petitioner's[sic] was pro se and thought he had the continuing services of counsel to file a timely memorandum in support of jurisdiction." ECF Dkt. #1 at 12. The Ohio Supreme Court's implied denial of the opportunity for Petitioner to file a memorandum in support of jurisdiction has nothing to do with Petitioner's failure to timely file an appeal to the Ohio Supreme Court. Further, a prisoner's pro se status and ignorance of the law do not constitute adequate cause to excuse a procedural default. *Bonilla*, 370 F.3d at 498, citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995). And as explained above, the undersigned questions Petitioner's explanation that he thought he still had representation by counsel before the Ohio Supreme Court since he did not present this assertion to the Ohio Supreme Court in his motion for leave to file a delayed appeal or in his accompanying affidavit. ECF Dkt. #8-1 at 118-121. And he did not exhaust claim of the ineffective assistance of appellate counsel as to this issue and thus it cannot serve as cause to excuse his procedural default because such a claim itself is procedurally defaulted.

29

*See Edwards*, 529 U.S. 446 Further, Petitioner makes no assertion concerning a miscarriage of justice or his actual innocence and he presents no new, reliable evidence of such innocence.

For these reasons, the undersigned recommends that the Court find that Petitioner has not presented adequate cause to excuse his procedural default and he has failed to establish a miscarriage of justice in order to excuse his procedural default of Ground for Relief Number 4.

The same reasoning and analysis applies to Ground for Relief Number 5.  Petitioner asserts in this Ground that his due process rights were violated because the trial court allowed the photograph of him holding a gun and the prosecution improperly attempted to impeach his sister's testimony through his mother's testimony.  *Id.*  These claims have already been addressed in the above analyses.  *See supra* at 20-29.  The undersigned recommends that the Court find that these grounds for relief are noncognizable and/or procedurally defaulted because they are essentially a combination of Grounds for Relief Numbers 1, 2, and 4.

Based upon the above, the undersigned recommends that the Court decline to address Grounds for Relief Numbers 4 and 5 because they are not cognizable before this federal habeas corpus Court and they are procedurally defaulted, without adequate cause to excuse the default. Further, no showing has been made of a miscarriage of justice or actual innocence.

### E.        Ground for Relief Number 6

In this ground for relief, Petitioner asserts that the trial court erred by not granting his motion

for a mistrial.  ECF Dkt. #1 at 9. He contends that his counsel repeatedly objected to the State's line of questioning of his mother on cross-examination because the prosecutor brought up his drug use and prior criminal charges.  *Id.*  Petitioner submits that his right to a fair trial was violated because the reference to his prior charges was made more than once and a curative instruction was insufficient to remedy the issue.  *Id.*

The undersigned recommends that the Court find that this ground for relief is noncognizable on federal habeas corpus review and it is otherwise procedurally defaulted.  Again, to the extent that

Petitioner asserts trial court error in admitting evidence of his prior charges and drug use, this is a state law issue and Petitioner asserted in the Ohio appellate court only Ohio evidence rules and Ohio law in arguing this claim. *See Estelle*, 502 U.S. at 482.  In addition, a trial court ruling on a mistrial is also a matter of state law abuse of discretion, which the Ohio appellate court found none, and it is not, without more, a basis for federal habeas corpus relief. *Sinistaj*, 66 F.3d at 808.

Moreover, the only time Petitioner mentioned a federal constitutional issue is in his Ohio appellate brief is when he used the term "fair trial."  ECF Dkt. #32-34.  Again, using general phrases like "due process of law" or "fair trial" do not rise to the level of raising a federal constitutional issue. *Fulcher*, 444 F.3d at798; *Newton*, 349 F.3d at 877.

Additionally, or alternatively, the undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief.  Even presuming that Petitioner had presented this ground for relief properly before the Ohio appellate court as a federal constitutional issue, and the Ohio appellate court had addressed it as such, he failed to timely file an appeal from that decision to the Ohio Supreme Court within 45 days from the entry of the Ohio appellate court judgment in which to file a timely appeal.  Ohio Sup.Ct. Prac. R. 7.01(A)1)(a).  He did not do so, and the Ohio Supreme Court denied his a motion for leave to file a motion for delayed appeal.  ECF Dkt. #8-1 at 117, 168.  This denial constitutes a "procedural ruling sufficient to bar federal court review" of a ground for relief in a federal habeas corpus petition. *Bonilla*, 370 F.3d at 497.  And as explained above, the undersigned recommends that the Court find that Petitioner's reasons for excusing his procedural default do not constitute sufficient cause, and he fails to show a miscarraige of justice or actual innocence. *See supra* at 20-30.

For these reasons, the undersigned recommends that the Court decline to review Petitioner's sixth ground for relief because it is not cognizable before this federal habeas corpus Court and/or it is procedurally defaulted.

31

## VI.    CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned RECOMMENDS that the Court decline to review all of Petitioner's grounds for relief because they are not cognizable before this Court and are procedurally defaulted.  Therefore, the undersigned RECOMMENDS that the Court DISMISS Petitioner's § 2254 federal habeas corpus petition (ECF Dkt. #1) in its entirety WITH PREJUDICE.


DATE: May 11, 2020                                  _/s/ George J. Limbert_____
                                                    GEORGE J. LIMBERT
                                                    UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).